2016 IL App (3d) 140276

Opinion filed July 22, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 21th Judicial Circuit, |
| TAMI BLUME, | ) | Kankakee County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-14-0276 |
| | ) | Circuit No. 11-D-184 |
| and | ) | |
| | ) | |
| BRAD BLUME, | ) | Honorable |
| | ) | Adrienne W. Albrecht, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Justices Schmidt and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1       The trial court entered a judgment dissolving the marriage of the parties, petitioner Tami Blume and respondent Brad Blume. On appeal, Brad argues the trial court abused its discretion by: (1) ordering him to pay child support in an amount below the statutory guidelines resulting in an improper maintenance award, (2) imputing income to him for farming in addition to the income he earned from his regular job as a farmhand, and (3) ordering him to pay Tami an excessive amount of maintenance. We affirm.

¶ 2                                    FACTS

¶ 3        On July 29, 1995, Tami and Brad were married. They had one child during the marriage, L.B., who was born on January 18, 1996. During the marriage, Brad worked as a farmhand and Tami stayed home to care for the home and the family. In 2007, Tami earned a two-year college degree and became a certified nursing assistant (CNA).

¶ 4        On April 18, 2011, Tami filed a petition for dissolution of the parties' 15-year marriage. On June 3, 2011, the trial court entered a temporary support order consistent with the parties' agreement. Among other things, Brad was to give Tami a $3000 advance of the marital funds and pay child support in the amount of $315 every two weeks. Tami was to receive title of a 2004 Grand Prix automobile, which was worth $2800. On November 7, 2011, Tami received an additional $1000 advancement of the marital funds.

¶ 5        On October 19, 2012, a hearing took place on the dissolution petition. The parties agreed that Tami would have custody of 16-year-old L.B. and Brad would have reasonable visitation. Brad indicated he was willing to pay $630 in child support per month based on his monthly salary and additional benefits he received from his employer in the form of housing and a work vehicle. Tami argued that Brad's income was higher than the sum of his salary and benefits because he had also earned more than $70,000 from farming land in the prior two years.

¶ 6        At the hearing, Brad testified he was 41 years old and had a high school education. He had been a farmhand for 20 years, and his salary was $42,000. The house Brad lived in, which had been the parties' marital home, was owned and paid for by Brad's employer as an employment benefit. Brad and Tami did not pay rent to live in the home or for most of the utilities during the marriage. After Tami left, Brad continued to reside in the home, and his employer continued to pay for most of the utilities. Brad's employer also provides Brad with a

work vehicle, which he occasionally uses for personal reasons. After the parties separated, Brad's parents bought him a $29,000 pickup truck and new appliances, for which he testified he would have to pay them back.

¶ 7   In addition to working as a farmhand in 2009 and 2010, Brad also farmed independently, earning $70,328 in 2009 and $78,480 in 2010. In April 2011, Brad stopped farming the crops he had planted in 2010. He had no crops in the ground when the dissolution petition was filed in 2011, and he did not plant anything in 2012. During his testimony, Brad was asked why he had stopped farming, and Brad responded that he had informed the landlord that he was going through a divorce and the landlord was worried about Brad "not being able to afford the farm with him the way it should be farmed." Brad testified that he had no current plans to return to farming because it was difficult to get farmland and he did not have the money for the up-front costs because he was paying child support and incurring legal fees from the divorce proceedings. Brad testified that, in general, agreements to farm someone's land are made by November to farm the land the following year.

¶ 8   Tami testified she was 41 years old. For the past two years, Tami worked 40 hours per week at a nursing home as a CNA and earned $10.60 per hour. Through her employment, Tami received health benefits and participated in a retirement plan. Tami testified that the cost to rent a home in the area of the parties' marital home was $800 to $900 per month, with the rentals not being as nice as the marital home. She could not afford such high rent, and so, when she first moved out of the marital home, she rented an apartment. Eventually, Tami rented a home owned by her father at a discounted rate of $500, which he had purchased specifically for her to rent from him. Tami testified that she would like to return to school to obtain her registered nursing (RN) degree, which she believed would take two years to complete. Tami also testified that in

3

March 2012, before she left Brad, he said that she needed to let him know if she was leaving him for sure because he had plans to farm but was not going to if she planned to leave him.

¶ 9        In closing arguments, Tami's attorney requested that Tami receive maintenance based on Brad's salary being at least $110,000 per year. She argued that at the very least an additional $12,000 per year should be added to Brad's income for his housing benefit and $6000 per year for his work vehicle benefit. She also requested $4000 per month in maintenance for five years and for child support to be calculated based on a gross income of $110,000.

¶ 10       Brad's attorney conceded that the trial court should impute the amount of the benefits Brad received from his employer when computing child support. Brad's attorney indicated that Brad earned a gross salary of $42,000 per year ($2900 per month) and argued that adding $1000 per month for Brad's housing and work vehicle "would be more than generous," for a total income of $4000 per month. Brad's attorney argued that child support should be $800 per month and maintenance should be $500 per month for two years for Tami to return to school.

¶ 11       The trial court made preliminary findings to help the attorneys in their "conversations with their clients" to aid in the parties' resolving the issues of child support and maintenance before the court rendered its decision. The trial court found that Brad's decision to quit independently farming was voluntary and the farming income would be imputed to Brad for the purpose of computing maintenance. The trial court also indicated it would order rehabilitative maintenance as opposed to maintenance in gross.

¶ 12       On August 7, 2013, the trial court entered its decision. The trial court found the parties were married for 18 years and had one child, L.B., who was 17 years old and about to enter his senior year of high school. L.B. "show[ed] every talent and ambition necessary to pursue his current plan of a college degree in engineering." During the marriage the parties lived in a home

4

titled in the name of Brad's employer, and Brad continued to live in that home as a benefit of his employment. Brad's employer paid for most of Brad's utilities and "provide[d] Brad with an expensive vehicle to drive." The trial court found that the value of the housing and other benefits that Brad received from his employer was $1500 per month ($18,000 per year) in addition to his farmhand salary.

¶ 13 The trial court also found that, until the separation of the parties, Brad "farmed independent of his employer, and [had] earned over $70,000" per year. The trial court found that Brad admitted to making "absolutely no effort to begin farming again, refused to commit to any future plans, and gave no credible reason for his failure to attempt to farm." The trial court found that Brad's parents purchased a car and new appliances for Brad, which did not overcome the presumption of a gift.

¶ 14 The trial court found that Tami lived in a home owned by her father and rented to her at a discounted rate because of her "impecunious circumstances." Tami had taken "substantial steps" to qualify for a licensed practical nurse (LPN) or RN program, and she would lose previously earned credits if she did not resume classes soon. It would take Tami two years to obtain an RN degree. The trial court found that during the marriage Tami took care of the family and the home while Brad spent the vast majority of his time at work.

¶ 15 The trial court found there was "very little property" to award. The vehicle driven by L.B. was awarded to Brad, who was required to maintain and insure the vehicle as long as L.B. was attending school. The parties were each awarded the items of personal property in their respective possession or control.

¶ 16 The trial court indicated, "[t]he parties have agreed on child support at the rate of $600 per month," and "in light of the trial court's award of maintenance, [the trial court] finds that the

5

amount is reasonable despite its failure to fully consider the income that Brad received in kind." As for maintenance, the trial court found that rehabilitative maintenance was appropriate, noting that Tami was not able to maintain the standard of living that she enjoyed during the marriage without additional training. The trial court also noted that Tami was in the process of obtaining such additional training to become a nurse when the marriage fell apart. The trial court ordered Brad to pay Tami $2000 per month in rehabilitative maintenance, reviewable at the end of three years.

¶ 17 On October 28, 2013, the trial court entered a judgment for dissolution of the parties' marriage. On November 26, 2013, Brad filed a motion to reconsider, arguing that the $2000 per month award of maintenance was excessive and the trial court erred in setting child support at $600 per month. Brad claimed the parties did not stipulate that child support should be set at $600 per month but had agreed that his paycheck stubs showed a monthly net income of $3000, and 20% for child support would be $600 per month. Brad argued that the $1500 per month imputed to his income for the additional employment benefits resulted in a monthly net income of $4500, and with an imputed amount of $3500 per month from farming, child support should have been set at $1600 per month. Brad requested an increase in child support so that the amount of the rehabilitative maintenance award would be reduced.

¶ 18 The trial court denied Brad's motion to reconsider. Brad appealed.

¶ 19                                    ANALYSIS

¶ 20 On appeal, Brad argues: (1) the trial court erred in awarding child support in the amount of $600 per month, (2) the trial court erred in imputing income to him for farming, and (3) the

6

trial court's award of maintenance in the amount of $2000 was excessive and against the manifest weight of the evidence.

¶ 21                                    I. Child Support

¶ 22        Brad argues that the trial court erred in setting child support at $600 per month. Brad notes that contrary to what the trial court found, the parties had not agreed to $600 per month in child support. Brad claims that child support should have been set at $982.50 based on his net pay of $1575 every two weeks as a farmhand ($40,950 per year) and his housing and work vehicle employment benefits that the trial court valued at $1500 per month ($18,000 per year). Brad additionally contends that if the trial court was correct in imputing additional farming income to him, then his net monthly income would have been approximately $8912.50, and child support should have been set at $1782.50 per month. Without citation, Brad argues that if the trial court had ordered him to pay the higher amount of child support, then that amount "would be deducted and considered when the Court decided on a maintenance award."

¶ 23        Tami responds that the trial court did not abuse its discretion in setting child support at $600 per month. Tami did not appeal or cross-appeal the amount of the child support award. Tami notes the parties had agreed on child support of $315 every two weeks when the trial court entered its temporary order on June 3, 2011. Tami claims, "[her] counsel never asked for more, and [Brad's] counsel never asked for less." She argues that the trial judge did not abuse her discretion "in setting child support around where the parties agreed when the minor would be emancipating in a few months."

¶ 24        We review the trial court's award of child support for an abuse of discretion. *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 391 (1990). In a proceeding for dissolution of

7

marriage, the court may order either or both parents to pay an amount reasonable and necessary for the support of a child. 750 ILCS 5/505(a) (West 2012).

¶ 25     Where child support is being set for one child, as is the case here, section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides a guideline of 20% of the supporting party's "net income" as the minimum amount of support. 750 ILCS 5/505(a)(1) (West 2012); *In re Marriage of Rogers*, 213 Ill. 2d 129, 133 (2004). Section 505(a)(3) of the Act defines "net income" as "the total of all income from all sources" minus certain deductions. 750 ILCS 5/505(a)(3) (West 2012). The statutory child support guidelines shall be applied unless the court finds a deviation is appropriate after considering the best interest of the child in light of the evidence, including, but not limited to one or more of the following: (1) the financial resources and needs of the child; (2) the financial resources and needs of the custodial parent; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the physical, mental and emotional needs of the child; (5) the educational needs of the child; and (6) the financial resources and needs of the noncustodial parent. 750 ILCS 5/505(a)(2) (West 2012).

¶ 26     In this case, when setting child support, the trial court noted that the parties had previously agreed to child support, and, in light of the maintenance award of $2000 per month, setting child support at $600 per month was reasonable. Although the trial court imputed income to Brad for maintenance purposes, it deviated from the statutory guidelines by not considering the same when setting the child support amount. A court may consider a number of factors when determining if a deviation from statutory support guidelines is warranted. See *Rogers*, 213 Ill. 2d at 139. Under the circumstances of this case, the available financial assets of the parties, the short duration of Brad's child support obligation, and in light of the court-ordered maintenance award of $2000 per month, the trial court did not abuse its discretion in deviating from the guidelines

8

and setting child support at $600 per month. Therefore, we decline Brad's request to raise his court-ordered child support obligation.

¶ 27                                     II. Imputed Income

¶ 28        Brad also argues that the trial court erred in imputing farming income to him. He contends that he had testified that farming was not a guaranteed income and varied from year to year. He also notes that he had testified that he stopped farming in 2012, which was a bad year for crops, and the availability of any future farming opportunities was mere speculation. Brad further contends that there was no evidence that he had refused an actual opportunity to farm.

¶ 29        Tami argues that the trial court was "very reasonable" in imputing income to Brad. She argues that Brad's decision not to farm was made in an attempt to minimize his income after he knew that she was pursuing a divorce.

¶ 30        The ability of the maintenance-paying spouse to contribute to the other spouse's support can be properly determined by considering both a current and future ability to pay ongoing maintenance. *In re Marriage of Lichtenauer*, 408 Ill. App. 3d 1075, 1089 (2011). Courts should consider the level at which the spouse is able to contribute, not merely the level at which he is willing to work. *Id.* at 1088. For the purpose of imputing income, a court must find one of the following: (1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity. *Id.* We will not disturb a trial court's finding of a party's income for the purpose of setting a support award absent an abuse of discretion. See *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1024 (2003) (a trial court's finding of the amount of a party's net income when setting child support is within the discretion of the trial court).

¶ 31        Here, the evidence showed that in the years leading up to the parties' divorce, Brad had earned a substantial amount of money from farming. The trial court did not find Brad's testimony that he quit farming due to factors out of his control to be credible. See *In re Marriage of Cerven*, 317 Ill. App. 3d 895, 903 (2000) (a trial court is in the best position to determine a witness's credibility, and a reviewing court will not overturn a credibility finding unless it is against the manifest weight of the evidence). The evidence, as found by the trial court, indicated that Brad voluntarily discontinued farming in light of the divorce and in an attempt to evade his support obligation. Consequently, the trial court did not abuse its discretion in imputing the farming income to Brad when setting maintenance where the trial court had found Brad's earning potential included income from farming. See *Lichtenauer*, 408 Ill. App. 3d at 1088 (the court may consider the parties' prospective incomes in addition to their current income when setting maintenance).

¶ 32                                    III. Maintenance

¶ 33        Brad additionally argues that the maintenance award of $2000 per month was excessive. He argues that Tami was only 41 years old and had the opportunity to complete her education during the marriage or during the pendency of the case, but she chose not to do so. Brad argues that Tami did not make reasonable efforts toward becoming self-supporting and the trial court should have considered her lack of motivation in determining maintenance. He also argues, without citation, that his payments to Tami for temporary child support and her 2012 federal and state tax refund of $9863, received in 2013, should have been considered a part of her income

10

when the trial court determined maintenance.[1] In addition, without citation of authority, Brad claims that the amount he paid in child support should be deducted from his income before calculating maintenance.

¶ 34    Tami responds to Brad's argument that the monthly maintenance award of $2000 was excessive by noting the trial court had found that Brad intentionally minimized his income and that his expenses were largely paid for by his parents and his employer. Tami further argues the award of rehabilitative maintenance of $2000 per month, reviewable in three years, was not an abuse of discretion in light of the parties' relatively long marriage, disparity in the parties' incomes, and the fact that Tami "took time off from her career to keep the home." She claims the maintenance award was "more than fair to Brad" under the maintenance laws at the time of award and the new statutory maintenance guidelines that have since been enacted.

¶ 35                          A. Child Support and Tami's Tax Refund

¶ 36    As a preliminary matter, there is no legal basis for Brad's contention that the trial court should have added child support payments to Tami's income to calculate Brad's maintenance obligation, inasmuch as those dollars are already considered to be part of Brad's income. See 750 ILCS 5/505(a)(3) (West 2012) (defining "net income" for the purpose of setting child support). We also note there is no statutory authority to support Brad's contention that a trial court should deduct child support payments from the income of the supporting spouse when determining the amount of maintenance in the same proceeding. In fact, under the recent addition of section 505(a)(3)(g-5) to the Act, effective January 1, 2015, the legislature specifically provides that the

---

[1] We have no confirmation of Brad's claim that Tami's refunds totaled $9863, but this figure appears to be a miscalculation when we look at her initial state and federal tax filings. On appeal, we only have Tami's initial 2012 tax return in the record before us.

amount of maintenance should be deducted from the supporting spouse's net income when determining the amount of child support—not the other way around as Brad suggests. See Pub. Act 98-961 (eff. Jan. 1, 2015) (adding 750 ILCS 5/505(a)(3)(g-5)). We acknowledge that section 505(a)(3)(g-5) of the Act, effective January 1, 2015, was not in effect at the time of the judgment in this case.

¶ 37        Additionally, contrary to Brad's argument, it would be inappropriate to include Tami's tax refund as part of her income when calculating Brad's maintenance obligation. In making this determination, we first look to section 504 of the Act, which directs the trial court to consider the income of the parties as a factor in setting maintenance. See 750 ILCS 5/504(a)(1) (West 2012). At the time of the maintenance award in this case, section 504 of the Act did not define income. See *id.* The current version of section 504 of the Act, however, provides, " 'gross income' means all income from all sources, within the scope of that phase [*sic*] in Section 505 of this Act." Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-1)). Section 505 of the Act pertains to child support and defines "net income" as "the total of all income from all sources" minus certain deductions. 750 ILCS 5/505(a)(3) (West 2012). Therefore, we can look to case law to interpret the phrase "the total of all income from all sources" under the child support section of the Act (section 505) to determine the meaning of "gross income" under the maintenance section of the Act (section 504). For the purpose of determining income for child support, even nonrecurring payments have been included in the statutory definition of net income, although payments that are unlikely to recur may be reason to deviate below the guideline amounts of support. *Rogers*, 213 Ill. 2d at 138-39.

¶ 38        Here, Brad's implicit argument is that Tami's "income from all sources" would include her tax refund when setting any maintenance amounts. As there are various reasons for which a

person could receive a tax refund from the government, we reject Brad's implicit assertion that Tami's tax refund should have been considered as additional income when calculating maintenance. *Cf. In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 391 (2002) (examining the details of respondent's tax return when determining whether his tax refund should be added to his income when calculating child support). In reviewing Tami's state and federal tax returns, it appears her refunds consisted of money that was overwithheld from her paychecks for taxes and money that resulted from certain tax credits.[2] Specifically, in addition to the overwithholding on her 2012 federal tax return, Tami claimed the "Earned Income Tax Credit" (EITC) and the "Additional Child Tax Credit" (ACTC). On her state tax return, in addition to overwithholding, Tami claimed the EITC and an education credit.

¶ 39        First, we look to whether the overwithholding portion of Tami's tax return should be added to her gross income to calculate Brad's maintenance obligation. A properly calculated withholding is the amount of properly calculated taxes owed from a person's gross income. *Id.* If a person overwithholds his estimated taxes from his pay, the overwithholding is an overpayment of taxes, which should be added back into a person's net pay when determining the person's net income. See *id.*; *In re Marriage of Pylawka*, 277 Ill. App. 3d 728 (1996). For example, in calculating child support based on "net income," if the noncustodial parent overwithholds the amount of taxes owed on his W-2 (thereby overpaying his taxes), the amount of the overwithholding should be added back to his net income to determine his support obligation under section 505(a) of the Act. See *Pylawka*, 277 Ill. App. 3d 728.

¶ 40        However, in this case, when calculating maintenance to be paid by Brad, the trial court considered Tami's "gross income" of $18,000, which already includes any tax overpayment that

_____

[2] Again, while Brad alludes to Tami's amended tax return in his brief on appeal, only Tami's initial 2012 tax return is included in the record on appeal.

Tami would have paid from that $18,000. In calculating the maintenance award, the court was able to use the actual amount of Tami's 2012 income as well as the actual amount of properly calculated taxes paid by Tami in 2012. See *Ackerley*, 333 Ill. App. 3d 382. The portion of Tami's tax refund resulting from overpayment of taxes from her gross income of $18,000—in essence, a savings to be received the following year as part of her tax refund—is not additional income. Thus, we find no support for Brad's contention that the overwithheld portion of Tami's tax refund, which is considered in Tami's gross income when determining maintenance to be paid by Brad, should also be considered as additional income to Tami.

¶ 41     Next, we address the Additional Child Tax Credit (ACTC). In 1997, the "Child Tax Credit" (CTC) provision was added to the Internal Revenue Code (26 U.S.C. § 24 (2000)) to " 'reduce the individual income tax burden [on families with dependent children, to] better recognize the financial responsibilities of raising dependent children, and [to] promote family values.' " *In re Hardy*, 787 F.3d 1189, 1194 (8th Cir. 2015) (quoting H.R. Rep. 105-148, at 310 (1997), *as reprinted in* 1997 U.S.C.C.A.N. 678, 704). Initially, the CTC was a $500 nonrefundable credit that reduced a taxpayer's tax liability dollar for dollar, at most reducing the tax liability to zero with no refund provided for an unused portion of the credit. Margot L. Crandall-Hollick, Cong. Research Serv., R41873, The Child Tax Credit: Current Law and Legislative History (2016). Since its initial enactment, the CTC has been amended to allow a partially refundable tax credit that can exceed a taxpayer's tax liability to provide a cash payment to low-income families who owe little or no income tax. *Id.* During the many amendments to the CTC, numerous lawmakers recognized and commented on the benefits of these amendments to low-income taxpayers. See, *e.g.*, *In re Hardy*, 787 F.3d at 1194-96 (citing 147 Cong. Rec. S5770-01 (daily ed. May 26, 2011) (statements of Senators Boxer, Snowe, Lincoln, Grassley, &

14

Wellstone), 147 Cong. Rec. S5028-01 (daily ed. May 17, 2011) (statement of Senator Baucus), Statement by President George W. Bush Upon Signing H.R. 1308, 2004 U.S.C.C.A.N. S27 (President Bush remarking that the amendments would increase the child tax credit for 7 million low-income families), and Statement by President Barack Obama Upon Signing H.R. 4853, 2010 U.S.C.C.A.N. S41 (President Obama commenting that the extension of the CTC combined with the payroll tax would lift 2 million families out of poverty)).

¶ 42       Currently, the CTC allows taxpayers to reduce their income tax liability by up to $1000 per child, and if the value of the CTC exceeds the amount of income tax owed, then the family may be eligible to receive a refund of remaining credit—known as the Additional Child Tax Credit (ACTC). 26 U.S.C. § 24 (2006); Crandall-Hollick, *supra* ¶ 41. To be eligible for the ACTC, a family's earnings must be at least $3000, with the amount of the ACTC increasing 15 cents for every dollar earned in excess of the $3000 minimum (up to the maximum amount of $1000 per child) and decreasing by $50 for every $1000 of modified adjusted gross income exceeding the maximum threshold. 26 U.S.C. § 24 (2006); Crandall-Hollick, *supra* ¶ 41.

¶ 43       After reviewing the purpose of the ACTC in its current form, we echo the conclusion of the Eighth Circuit federal court of appeals: "As evidenced by the various amendments to the initial CTC and the accompanying legislator's comments about those changes, the intent of the legislature when modifying the ACTC was to benefit low-income families." *Hardy*, 787 F.3d at 1196. As the intent of the ACTC is to benefit low-income families, we cannot see how the ACTC credit that Tami received for the year that she separated from Brad and was a single parent to L.B., without having yet received any maintenance from Brad, should be added to her gross income and essentially be used to decrease Brad's maintenance obligation for future years. In addition, when actually receiving maintenance, Tami's ACTC credit may be less or even

15

nonrecurring. That fact would justify a deviation from any statutory definition of income and support guidelines. See *Rogers*, 213 Ill. 2d at 139.

¶ 44        Finally, we examine the federal Earned Income Tax Credit (EITC), authorized by section 32 of the Internal Revenue Code, and the Illinois EITC. The federal EITC is a refundable tax credit for eligible workers earning relatively low-to-moderate income. Gene Faulk & Margot L. Crandall-Hollick, Cong. Research Serv., R43805, The Earned Income Tax Credit (EITC): An Overview (2016). The EITC was initially enacted in 1975 to encourage economic growth and to " 'assist in encouraging people to obtain employment, reducing the unemployment rate, and reducing welfare rolls.' " *Id.* at 10 & n.21 (quoting S. Comm. on Finance Report to Accompany H.R. Res. 2166, S. Rep. 94-36, at. 33 (1975)). Increased EITC benefits are focused on low-income earners near the poverty line, with greater earners receiving reduced EITC benefits. *Id.* The State of Illinois has a similar EITC, as well as an education credit for families. 35 ILCS 5/212, 5/201(m) (West 2012).

¶ 45        After individuals and families file their federal income tax return, the EITC is given in a lump sum payment in the form of (1) a reduction in federal tax liability, (2) a refund where the tax filer has no tax liability, or (3) a combination of a reduced federal tax liability and a refund. Faulk & Crandall-Hollick, *supra* ¶ 44. To be eligible for the EITC, the tax filer must, among other things, file a tax return and have an annual adjusted gross income below a certain threshold—in 2015, these thresholds ranged from an adjusted gross income of $14,820 for an unmarried tax filer with no qualifying children to $53,267 for married joint tax filers with three or more qualifying children. *Id.* The exact threshold amount depends on the tax filer's marital status and number of dependent children. *Id.*

¶ 46 Similar to the ACTC, given that the function of the EITC is to assist low-income earners, Tami's 2012 EITC refund received in 2013 should not be added to her gross income when calculating Brad's maintenance obligation in order to reduce Brad's future maintenance obligation. Nor should her Illinois EITC or her education credit be used to lower Brad's maintenance obligation.

¶ 47 It is inappropriate under the circumstances of this case to allow Brad to claim, to his benefit, a reduction when setting his future maintenance obligation as a result of amounts received by Tami from government assistance programs for low- and middle-income earners. Essentially, such an approach would shift Brad's maintenance obligation, in whole or part, to the state and federal governments. This is especially true when we consider that those refund amounts could be less or nonrecurring when the maintenance is actually being paid.

¶ 48 B. Whether the Maintenance Award Is Excessive

¶ 49 Pursuant to section 504(a) of the Act, a trial court may grant maintenance to either spouse in an amount, and for a duration of time, that the court deems just after considering all relevant factors. 750 ILCS 5/504(a) (West 2012). Section 504(a) of the Act lists the following 12 factors to be considered by a court when ordering maintenance: (1) income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance; (2) the needs of each party; (3) earning capacity of each party; (4) impairment of present and future earning capacity of the party seeking maintenance as a result of a devotion of time to domestic duties or forgoing or delaying education, training, employment, or career opportunities due to the marriage; (5) time needed for the party seeking maintenance to acquire appropriate education, training, and employment and whether that party is able to support

17

himself or whether that party has custody of a child making it appropriate for the custodian not to seek employment; (6) standard of living established during the marriage; (7) duration of the marriage; (8) age and physical and emotional condition of both parties; (9) tax consequences of the property division; (10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (11) any valid agreement of the parties; and (12) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2012).

¶ 50      Rehabilitative maintenance, rather than permanent maintenance, may be appropriate when a spouse's future employability would provide a similar standard of living as enjoyed during the marriage. *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 159 (1993). Rehabilitative maintenance is designed to enable a spouse to develop the skills necessary to support themselves so that the former spouses may become independent from one another as soon as is practicable. *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 93; *In re Marriage of Hucker*, 259 Ill. App. 3d 551, 555 (1994).

¶ 51      In determining the amount of maintenance, the court will look to the reasonable needs of the party seeking maintenance, as measured by the standard of living the parties enjoyed during their marriage. *In re Marriage of Keip*, 332 Ill. App. 3d 876, 878-79 (2002). A trial court's determination of maintenance will not be altered absent an abuse of discretion or finding that the award is against the manifest weight of the evidence. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005); *Lichtenauer*, 408 Ill. App. 3d at 1087.

¶ 52      In the present case, the evidence showed that both parties were 41 years old at the time of the dissolution. Brad worked as a farmhand earning $42,000 per year and had a high school education. During the marriage, Tami was responsible for the domestic duties and child rearing

18

while Brad worked, which delayed Tami's career. During the marriage, Tami earned a two-year college degree. She intended to continue her education to obtain a nursing degree, which would likely take two additional years to complete. There was little evidence presented as to the parties' standard of living during the marriage. In reviewing the evidence presented, rehabilitative maintenance in the amount of $2000 per month was not excessive, given the length of the marriage, Tami's current and potential earning capacity, the time needed for her to obtain her nursing degree, and her likelihood of self-sufficiency soon after completing her nursing degree.

¶ 53   By way of comparison, although the current statutory guidelines—effective January 1, 2015—were not in effect at the time maintenance was awarded in this case, we can compare the maintenance award in this case against those guidelines in determining whether the maintenance was excessive. Unless the court finds the application of the guidelines to be inappropriate, the current maintenance guidelines mandate that where the combined gross income of the parties is less than $250,000, and there is no prior child support or maintenance obligation from a prior relationship, maintenance shall be (1) 30% of the payor's gross income minus 20% of the payee's gross income (however, the sum of the gross income of the payee and the maintenance awarded to the payee must not exceed 40% of the parties' combined gross income) and (2) set for a duration of time that is calculated by taking the length of the marriage at the time the action was commenced and multiplying it by: (a) 0.20 for 5 years or less, (b) 0.40 for more than 5 years but less than 10 years, (c) 0.60 for 10 years or more but less than 15 years, or (d) 0.80 for 15 years or more but less than 20 years. Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-1)).

¶ 54   In this case, with the imputed farming income, Brad's gross annual income was approximately $110,000. Tami's 2012 tax return showed her gross annual wages were $18,191.

19

In calculating maintenance under the current guidelines, 30% of Brad annual income minus 20% of Tami's annual income would produce a maintenance award of $2447 per month ($29,362 per year). See Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-1)). When the $29,362 amount of annual maintenance is added to Tami's annual gross income of $18,191, the sum of $47,553 does not exceed 40% of the parties' combined gross income of $128,191 per year.[3] In addition, under the new maintenance award guidelines, the duration of the maintenance award would be 12 years—15 years of marriage as of the date Tami filed the dissolution petition multiplied by a factor of .80. See Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-1)). Thus, considering that the current maintenance guidelines could have produced a monthly maintenance award of $2447 for 12 years, the maintenance award of $2000 per month to be reviewed in three years in this case was not excessive and was not an abuse of the trial court's discretion.

¶ 55                                            CONCLUSION

¶ 56           The judgment of the circuit court of Kankakee County is affirmed.

¶ 57           Affirmed.

---

[3] In calculating maintenance under the new guidelines, the child support awarded to Tami in this case would not be added to Tami's gross yearly income because it is calculated as part of Brad's gross income under the statutory formula. See Pub. Act 98-961, § 5 (eff. Jan. 1, 2015) (adding 750 ILCS 5/504(b-1)).