**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210340-U

Order filed November 18, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* MARRIAGE OF DAMIAN E. PRIETO, | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Petitioner-Appellant, | ) | Rock Island County, Illinois, |
| | ) | |
| and | ) | Appeal No. 3-21-0340 |
| | ) | Circuit No. 20-D-33 |
| | ) | |
| DEBRA L. PRIETO, | ) | Honorable |
| | ) | Linnea E. Thompson, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Daugherity and Hauptman concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court's maintenance and equalization awards were not an abuse of discretion.

¶ 2    Damian E. Prieto, the petitioner, filed a petition for dissolution of marriage to dissolve his marriage to Debra L. Prieto, the respondent (750 ILCS 5/401 (West 2020)). Following a trial, the circuit court granted the petition to dissolve the marriage and awarded the respondent maintenance and an equalization award. The petitioner appeals.

I. BACKGROUND

¶ 4       At the outset, we note that a limited background is provided in this case as the only issues on appeal pertain to the maintenance and equalization awards.

¶ 5       The parties were married on September 4, 1999. On January 28, 2020, the petitioner filed a petition for dissolution of marriage. The petitioner was 47 years old and the respondent was 48 years old. On June 8, 2021, the matter proceeded to trial where the parties testified.

¶ 6       The petitioner testified that he worked in the heating, ventilation, and cooling (HVAC) business. His last four years of gross income averaged $86,772.75 per year (2017: $82,492; 2018: $89,542; 2019: $87,010; 2020: $88,047). The petitioner stated that he had a 401(k) retirement account that he earned during the marriage that was valued at $214,824.39. He also testified that he had two other retirement accounts valued at $19,102.29 and $5,216.49. The parties owned multiple vehicles, such as a Subaru Outback, two all-terrain vehicles, a Harley Davidson motorcycle, and a Ford Escape. The petitioner asked to keep all of the vehicles except for the Ford Escape, which was driven by the respondent. The petitioner stayed in the marital home during the proceedings and wished to keep the home. He was willing to refinance to remove her name from the mortgage. When the respondent left the home, she did not take any furniture, only her clothes and personal items.

¶ 7       The petitioner further testified that, during the marriage, he was the primary provider while the respondent stayed at home with their son (who was 19 at the time of trial). The respondent ran an at-home daycare, and then, when their son was older, she started different jobs. The petitioner testified that the respondent worked many jobs during the marriage where she took care of people, and she tried to be a paramedic. He stated that her last job was cleaning houses. The petitioner stated that the respondent graduated from high school and attended college but he was not sure

what type of certification she received.

¶ 8    The respondent testified that, at the time of the hearing, she was unemployed and receiving $300 in unemployment benefits per week. She stated that she was making phone calls for her brother who started his own company, but she was not getting paid as she was trying to help him get his business started. The respondent stated that she would eventually make commission. The last job she held was four to five months prior at The Arc as a direct support professional for development for disabled individuals. She stated that she would have to physically restrain children and adults twice her size on a daily basis. The respondent stated that she left that job because it became too much as she was tossed around, bit, her hair was pulled out, and she could not manage it with the divorce. She worked 38 to 42 hours per week and made $11.75 per hour.

¶ 9    The respondent testified that she was ready to go back to work despite sciatica and arthritis in her back and hip that was painful. She stated that she was capable of working a full-time job and believed she could go back to making a wage of $11.75 per hour. She stated that the most she ever made was $15 per hour as a 911 dispatcher, which she left to become an EMT. After the respondent received EMT certification, she was unable to continue because she found it too emotional. She stated that, in the first couple of months, there was a lot of death and child abuse and she could not handle it. The respondent did not renew her EMT certification. She testified that she has been taking classes for the past couple of years and received certifications in medication distribution, cardiopulmonary resuscitation (CPR), disability, and safety. She has applied to various jobs online and even had a couple of interviews. She said she applied for a position at an equestrian business to assist with cleanup and help children with riding lessons, housekeeping jobs, and home care positions.

¶ 10    The respondent provided that her living expenses totaled $2,200 per month and she

received $204 per month in Supplemental Nutrition Assistance Program (SNAP) benefits. She rents a home where the landlord provides the furniture, such as the bedroom and living room furniture, and plates and silverware. The respondent stated she owned a couple of things inside the home, such as small side tables. She stated that she is a plaintiff in a personal injury lawsuit from when she was bitten by a dog in 2018, which required surgery to remove skin from her neck and apply it to her face. She was also bitten on her arm, which was seriously infected.

¶ 11      The respondent testified that she owed her father $9,100 for loans over the years for various items such as vehicle repairs and for the installation of a fence after the dog bite. During the petitioner's testimony, he denied that these were loans. However, the respondent stated that she would never accept a gift of that magnitude from her retired father and that she intended to pay him back when she was able. The respondent provided that she already paid her father back $900 (the original balance was $10,000), and after questioning from the petitioner's attorney, stated that she would take on the debt herself. The respondent's counsel objected and argued that the respondent was being badgered, just as she had been in the marriage, and gave up (conceded to take the debt). The court stated it would take that into consideration in its final decision. The respondent also testified that her and the petitioner would go on family vacations and they traveled often for their son's hockey. The respondent stated that she can no longer afford to go on vacation.

¶ 12      In closing arguments, the petitioner asked the court to deny maintenance. He argued that the respondent was underemployed and she had "the ability to make at least minimum wage." The respondent asked for a maintenance award to compensate for the fact that she was a stay-at-home mom, which came with household duties, and gave the petitioner the ability to earn money.

¶ 13      The court entered its judgment for dissolution of marriage. It awarded the petitioner the marital residence and provided that the respondent shall (1) execute a quitclaim deed releasing her

4

interest and (2) receive one half of the equity. The court divided various property, such as vehicles (notably two awarded to the petitioner were subject to loans), firearms, and the petitioner's smaller retirement accounts,[1] where the petitioner received assets valuing $30,890 and the respondent received assets valuing $3,370.

¶ 14      The court noted that the petitioner's primary 401(k) had a value of $214,824.39. The court awarded the respondent the first $43,000, as an equalization payment, and then ordered the remaining balance to be equally split between the parties. The court made note of the petitioner's future monthly retirement benefit and found that the respondent, as alternate payee of said benefits, shall be awarded half of the marital portion of said benefits. The petitioner was awarded the other half of the marital portion and all non-marital portions. The court also awarded the petitioner 10% of the respondent's net personal injury award, if any, that she receives relating to her lawsuit.

¶ 15      The court also found that the parties stipulated to the allocation of debt where (1) the petitioner was responsible for a credit card ($3,000); and (2) the respondent was responsible for another credit card ($3,000), medical bills relating to the dog bite ($1,600), and the remaining balance for the loans owed to her father ($9,100). The court made note that the respondent assumed marital debt that she hoped to pay from the proceeds of her personal injury case. However, the when/if and how much the personal injury claim would be was unknown. The court also ordered the parties to be responsible for their own fees and costs. The table below demonstrates how the circuit court allocated assets and debts in this case.

---

[1] The petitioner testified that these were the balances of his retirement accounts. *Supra* ¶ 6. We note that when the circuit court entered its judgment of dissolution of marriage, it provided that the balance of one of the accounts was $4,216.49 instead of the $5,216.49 that was testified to by the petitioner. The balance of $5,216.49 was reiterated in the petitioner's financial affidavit. Therefore, we proceed with the amount of $5,216.49 when valuing the marital estate.

|  | Petitioner | Respondent | Marital Estate |
|---|---|---|---|
| **All Other Property** | $30,890 | $3,370 | $34,260 |
| **Equalization Payment** | $0 | $43,000 | $43,000 |
| **401(k) Distribution ($214,824-$43,000)/2** | $85,912 | $85,912 | $171,824[2] |
| **Marital Debt** | -$3,000 | -$13,700 | -$16,700 |
| **Total Amount** | $113,802 | $118,582 | $232,384 |
| **Percentage** | 48.97% | 51.03% | 100% |

¶ 16　　The court awarded the respondent maintenance in the amount of $997.95 per month for a period of 244 months (the same length as the marriage). The court found that the petitioner's annual net income was $57,580.77 and imputed to the respondent a gross annual income of $24,400 ($11.75 hourly wage x 2080 hours per year) and a net annual income of $18,428.64.

¶ 17　　The court considered the various relevant factors when awarding maintenance (750 ILCS 5/504(a) (West 2020)) and found: (1) the petitioner's gross monthly income was $7,337 based on his 2020 federal income tax return; (2) the respondent was unemployed but hoped to secure at least part-time employment; (3) the parties were to equally split the net equity in the marital residence; (4) the respondent was being awarded a portion of the petitioner's 401(k); (5) the respondent assumed marital debt which she hoped to pay from proceeds of a personal injury case where she

[2] The 401(k) distribution is calculated by taking the total balance of the 401(k) ($214,824) and first subtracting the equalization payment ($43,000), which left $171,824 to be split equally. Therefore, after accounting for the equalization payment, each party was awarded $85,912 of the 401(k). These figures are rounded for illustration purposes only.

was bitten by a dog; (6) each party provided for their own basic needs; (7) the bulk of the respondent's household possessions and furnishings were provided by her landlord and included in her monthly rent; (8) the petitioner had a long employment history in the HVAC industry and earned at minimum $80,000 in the last couple of years; (9) the respondent's net annual earnings did not exceed $13,000 and it was unlikely that her earning capacity would ever come close to the petitioner's; (10) the respondent delayed her entry into employment outside of the home until the parties' son was a teenager; (11) the respondent was certified as an EMT but was unable to cope emotionally with the duties of an EMT and was no longer certified; (12) the petitioner had no known impairment to his earning capacity; (13) during the marriage the parties went on vacations, purchased a home, purchased numerous vehicles, and traveled with their son's hockey team; (14) the parties were married for 244 months; (15) the parties are in their late 40's and are in generally good health (noting the respondent's arthritis and sciatica); (16) the respondent received SNAP benefits; and (17) early withdrawals from the 401(k) will result in a tax penalty.

¶ 18    The petitioner appeals.

¶ 19                                II. ANALYSIS

¶ 20    On appeal, the petitioner argues that the court's maintenance and equalization awards were an abuse of discretion. We address each contention in turn.

¶ 21    Section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) authorizes a circuit court in dissolution proceedings to award either spouse maintenance in amounts and for periods of time as the court deems just. 750 ILCS 5/504(a) (West 2020). Section 504(a) sets forth the factors the court considers when determining whether to grant maintenance:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all

7

financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education,

training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

¶ 22     The purpose of maintenance is to enable a spouse who is disadvantaged through marriage to enjoy a standard of living proportionate with that during the marriage. *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970 (1992). A spouse requesting maintenance has a duty to seek and accept appropriate employment. *Id.* In instances where a spouse is voluntarily unemployed, the court may impute income to that spouse when calculating maintenance. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. The amount of income imputed must be supported by evidence of record demonstrating that it is comparable with the spouse's skills and experience. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40. The court may consider the spouse's income from previous employment but should not consider outdated data that no longer reflects the spouse's prospective income. *Id.* A maintenance award is within the sound discretion of the court and its decision will not be disturbed absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). An abuse of discretion occurs where the court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt its view. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94.

¶ 23     The petitioner first argues that the court erred when it used $11.75 per hour to calculate the respondent's income when Illinois minimum wage is $12 in 2022 and increasing one dollar per year to $15 per hour in 2025 (citing 820 ILCS 105/4(a)(1) (West 2020)). He contends that the court determined that the respondent may be employed for a wage less than the legal minimum and that the court charged him with coming up with the difference.

9

¶ 24    The petitioner's position before the circuit court was that no maintenance should be awarded in this case as the respondent had "the ability to make at least minimum wage." At the time of trial, June 8, 2021, the minimum wage was $11 per hour. *Id.* The court calculated the respondent's income at a higher rate than minimum wage, $11.75 per hour, the respondent's last earned wage from four or five months prior. At no point did the petitioner alternatively argue before the court that the respondent's income should be based on $12 per hour or anticipate that the minimum wage is set to increase $1 per year until 2025. Arguments not raised before the circuit court are forfeited and cannot be raised for the first time on appeal. *Mabry v. Boler,* 2012 IL App (1st) 111464, ¶ 15. Instead, the court appropriately determined that the respondent was entitled to maintenance per the statutory factors (*supra* ¶ 17) and made the determination to use the $11.75 hourly rate based on the evidence of record, specifically, her most recent employment. See *Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40. Also, the Act specifically provides for modification of maintenance upon a showing of substantial change of circumstances, and one of the factors the court considers is the increase or decrease in each party's income since the prior judgment. See 750 ILCS 5/510(a-5)(7) (West 2020).

¶ 25    The petitioner next argues that the court erred by not using the wage of $15 per hour that the respondent received at one point in the marriage. He states that she enjoyed being a 911 dispatcher and she was capable of doing the job. The petitioner asks this court to take judicial notice of a job posting from the City of Moline providing that an emergency communications dispatcher currently earns $45,765.20 to $69,636.95. Again, we reiterate that the petitioner did not ask the court to use a wage of $15 per hour to calculate the respondent's income and the $11.75 per hour wage was supported by the evidence. Further, although there are circumstances where this court will take judicial notice of a government website (see *Kopnick v. JL Woode Management*

10

*Co., LLC*, 2017 IL App (1st) 152054, ¶ 26), this request is inappropriate as the job posting was never presented to the circuit court for consideration. Therefore, we need not consider it.

¶ 26 The petitioner also argues that the maintenance award was made when considering the petitioner's income during the last four years of marriage instead of the entire marriage where the parties previously lived off of a lower standard of living with an annual net income of around $36,614. Thus, he argues that he should not be required to provide a standard of living beyond what the respondent was accustomed to for the majority of the marriage. The petitioner cites no authority to support this contention. Arguments must include the appellant's reasons along with citation to relevant authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) ("An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of [Rule 341]."). Moreover, the court is afforded discretion to base maintenance on the standard of living the parties enjoyed during their marriage. *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 51. Based on the record before us, the court's decision was not arbitrary, fanciful, or unreasonable. Therefore, the court did not abuse its discretion when it awarded maintenance.

¶ 27 Last, the petitioner argues that the court abused its discretion when it awarded the respondent an equalization award of $43,000 because the parties did not even have $43,000 in assets. He argues that the maximum difference in the assets awarded is $26,520 ($29,890-$3,370)[3] and the court ordered nearly twice the difference. He asks this court to vacate the equalization award and remand for the court to recalculate the equalization based on the aforementioned values.

¶ 28 The petitioner fails to consider the entirety of the marital estate as it relates to the allocation

---

[3] We reiterate that these figures use the incorrect balance for one of the smaller retirement accounts as $4,216.49 instead of $5,216.49. Also, these figures only consider assets and not debts.

of assets and debts. When viewing the marital estate as a whole, including the equalization award, the respondent was awarded $4,780[4] more than the petitioner. *Supra* ¶ 15. Stated another way, the respondent received 51.03% of the marital estate and the petitioner received 48.97%. The record is clear that the court took the parties' debts into consideration when it made its asset allocations. The equalization award was a nonarbitrary method to balance the marital estate. We fail to see how the equalization award was an abuse of discretion.

¶ 29                                    III. CONCLUSION

¶ 30          For these reasons, the judgment of the circuit court of Rock Island County is affirmed.

¶ 31          Affirmed.

---

[4] When considering both assets and debts, the respondent was awarded $118,582 and the petitioner was awarded $113,802.