2021 IL App (2d) 210199-U
No. 2-21-0199
Order filed September 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>ROBERT J. GREGG, | ) ) ) | Appeal from the Circuit Court<br>of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 19-D-548 |
| HOPE T. GREGG, | ) ) ) | Honorable<br>Charles D. Johnson, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court acted within its discretion in restricting Hope's parenting time and ordering her to engage in reunification therapy. It was not an abuse of discretion or against the manifest weight of the evidence to award Robert primary residential custody and the majority of parenting time, nor was it against the manifest weight of the evidence for the trial court to give all decision-making authority to Robert. The trial court did not abuse its discretion in imputing a $30,000 income to Hope or in treating Robert's restricted stock units as property. However, the trial court abused its discretion in failing to consider Robert's 2020 stipulated total gross salary when determining his income; we reverse and remand its determinations of maintenance and child support as a result. The trial court's valuation of the marital residence and classification of certain items within the house as marital property was not against the manifest weight of the evidence, and it acted within its discretion in awarding the home and disputed household items to Robert. Therefore, we affirm in part, reverse in part, and remand.

¶ 2    Respondent, Hope T. Gregg, appeals from the trial court's order dissolving her marriage to petitioner, Robert J. Gregg, and from the trial court's allocation judgment regarding the parties' children. Hope raises nine issues on appeal, arguing that the trial court erred in: (1) placing restrictions on her parenting time; (2) requiring her to engage in reunification therapy; (3) awarding Robert primary residential custody and the majority of parenting time; (4) awarding sole decision-making authority to Robert; (5) the amount of maintenance it awarded Hope; (6) the amount of child support it ordered Hope to pay; (7) its valuation of the marital residence; (8) awarding the residence to Robert; and (9) classifying curtains, curtain rods, and a chandelier as marital property and awarding them to Robert. We conclude that the trial court abused its discretion in calculating Robert's income, which affects the trial court's awards of maintenance and child support. We therefore affirm in part, reverse in part, and remand the cause.

¶ 3                                    I. BACKGROUND

¶ 4    The parties were married on October 14, 2000, and had two children: D, born on March 22, 2005, and K, born on May 8, 2007. On April 4, 2019, Robert filed a petition for dissolution of marriage. On December 30, 2019, the trial court appointed a guardian *ad litem* (GAL) for the children and ordered that the GAL submit a report regarding parenting time and decision-making responsibilities.

¶ 5    On February 26, 2020, based on the GAL's recommendation, the trial court ordered Hope to move out of the family home and that her parenting time temporarily be supervised by a family member.

¶ 6                              A. Issues Regarding Children

¶ 7    A trial took place on March 1 and 2, 2021. Catherine Wifler, the GAL, provided the following testimony. At the time the trial court appointed her, D was 14 and K was 12. She met

with them in person. They were "in severe crisis as it related to their relationship" with Hope. D was very eloquent and detailed in describing the relationship. D discussed years of Hope verbally and emotionally abusing her, described harming herself, and said that she was under a therapist's care. The home environment had been extremely volatile, but D described Robert as nurturing and providing her with a relatively calm existence.

¶ 8 D also recounted a 2018 Department of Children and Family Services (DCFS) investigation. As D spoke, she became physically agitated and was upset and shaking. The GAL later watched a video of D's DCFS interview. D "was really physically affected and upset and obviously emotionally traumatized by that experience." D had been in her room and undressed from the top up, and Hope was also in the room. D "felt extremely uncomfortable as far as that scenario occurred." DCFS determined that there was no reason to investigate further, but the GAL's discussions with D's therapist indicated that there was "more to it than what had been investigated during that time."

¶ 9 K told the GAL "in a lesser intense way" that he was afraid to be with Hope because she often engaged him in inappropriate conversations about the divorce and constantly asked if he loved her. In 2018, the police were called to the home because Hope had lost her temper and was screaming, and the GAL's recollection of the police report was that K ended up "running away down the street."

¶ 10 Both children said that they did not see family or friends even before the Covid-19 pandemic because Hope did not want them to have relationships with other people. Further, in 2019, the family members were "living separately in the same house" and not engaging in normal communication. When conversations escalated into arguments or screaming matches, Robert

would remove the children from the house to deescalate the situation. The GAL talked to the children's therapists, and they both confirmed what the children had been going through.

¶ 11    When the GAL met with Hope, Hope talked about how she felt betrayed by Robert filing for divorce and was "not really willing to concern herself with what [was] happening to her children." In the GAL's first report to the court in mid-February 2021, she recommended that Hope move out of the house so that the children could be more comfortable there. Hope thereafter refused to talk to the GAL. After Hope left the house, she did not visit the children because of the Covid-19 pandemic, even though the GAL explained to Hope's attorney that the stay-at-home order did not prevent Hope from exercising parenting time. The children had not seen Hope for a couple of months when Hope's mom texted Robert to drop them off in a couple of hours because Hope wanted to have her parenting time. The children started seeing Hope at that point, but they had not seen Hope in the few months prior to trial because Hope's mother no longer wanted to supervise.

¶ 12    The GAL had been in contact with the reunification therapist. The therapist said that it took Hope a little while to engage in therapy. The therapy sessions were currently over the phone and were "more of a supervised parenting phone call." Hope's behavior had not changed insofar as being able to relate to the children, but the children had learned coping mechanisms to use if Hope began inappropriate conversations. The therapist believed that the children "would be able to move forward as long as it continued in a supervised fashion."

¶ 13    The GAL's impression of Robert was that he was "exemplary" in how he parented the children. The children were loving and close to him, trusted him, and felt safe with him.

¶ 14    When asked how the children would be affected if they had to spend more time with Hope, the GAL replied:

"I feel that in the event 'D' *** would spend more than two hours with mom in an unsupervised situation *** it would be emotionally damaging to her and potentially raise not only self harm but worse than that. It's not just my impression but also the impression and the description of what could happen in that scenario from [D's] therapist."

K's relationship with Hope was not as volatile as D's, but he and his therapist indicated that he did not feel safe with Hope and felt that she often required him to engage in uncomfortable conversations.

¶ 15 The GAL recommended that parenting time with Hope be reestablished and supervised. There needed "to be a transition period perhaps with [the] family visitation center in Mundelein" for a couple of weeks. Then, there could be one-hour visits, then two hours two times per week, and "maybe review in six months to see if there is some healing." The kids trusted the reunification therapist, who felt that things were progressing, so the GAL believed that reunification therapy should continue. Robert seemed to want to facilitate visitation and therapy as much as he could. The GAL thought that "extreme endangerment mentally and emotionally *** could occur in the event that the children [were] put in a situation where regular parenting time or unsupervised at this time would possibly cause."

¶ 16 Hope and Robert did not talk to each other and had not talked for a long time. An example was Hope's mother texting Robert that Hope wanted to start her parenting time. At another point, Hope put a note in the mailbox to try to set up a parenting time. The trial court ordered the parties to sign up for "Our Family Wizard" the prior month to facilitate communication about parenting time. Because Hope and Robert did not communicate, the GAL did not know how they could make decisions together regarding the children. It was reported to the GAL that Hope had not gone to parent-teacher conferences or taken the children to the doctor for several years, but rather Robert

had assumed those responsibilities. For these reasons, the GAL recommended that Robert make all decisions regarding the children's education, healthcare, religion, and extra-curricular activities.

¶ 17    Hope had told the GAL that Robert had an alcohol problem that caused a lot of issues in the family. However, Robert told the GAL that he had stopped drinking eight years prior, and she confirmed with his therapist that he was a recovered alcoholic. The children also said that it was not an issue for them.

¶ 18    Robert testified as follows. D was almost 16 years old, and K was almost 14 years old. When they were born, Robert worked outside the home and Hope took care of the children. Things became "more complicated" when the kids began school, and he began taking over parental responsibilities. By the time D was in fourth grade, he was the parent who went to the parent teacher conferences, interacted with the children's friends' parents, took the children to doctor's appointments, did homework with them, put them to bed, and woke them up in the morning. Robert believed that he had been the primary decision maker and caregiver for the children for at least the past five years.

¶ 19    D's conflicts with Hope began when D was eight or nine years old and became worse as D got older. When D was 13, it was "untenable." It was "hard to quantify because these arguments started over nothing, and would get expanded to encompass the entire world of events in the house." There were food and diet issues as well as name calling. Hope had called D a "fat pig" and had called both children "assholes." Robert would try to explain to the kids that they had not done anything wrong but that to calm the situation they would still have to apologize to Hope. She also did not allow the children to have friends over at the house because she did not want anyone to see the house until it was "finished," but the house was never "finished." The family would visit

Hope's brother and his family on the holidays and occasionally see Hope's parents, but they were isolated from other relatives. D had begun scratching herself due to emotional confrontations with Hope and had started seeing a therapist as a result.

¶ 20    Life at home was currently a little stressful because Robert was working from home and the children were doing remote learning due to the pandemic, but they were getting along well. They would chat in the kitchen at times during the day, have dinner together at night, and try to do fun things on the weekends. When visitation with Hope started, D would come home and remain upset for a long time, but the therapist had taught both children coping skills that they were using. Hope had not seen the children for several months because both her mother and sister had declined to supervise visits. Robert wanted Hope to have a healthy relationship with the children and would do everything possible to help.

¶ 21    Robert had last drunk alcohol on December 2, 2012. He went to AA meetings after that, and there was a period where it was a "challenge" for him, but that period lasted a matter of months, not years. Alcohol had not been an issue for a long time.

¶ 22    Hope testified that she lived five minutes from the marital residence in a three-bedroom townhome, where the children could have their own bedrooms. She had a good relationship with D, did not verbally or emotionally abuse her, and never called her a "fat pig" or insulted her. There was currently drama because of the divorce. Also, D was a teenager, and there were going to be times where they would disagree and D would be angry. They had "to talk about diet since [D] was a toddler" because D was a "bigger girl," so from the time D began solid food Hope "always had to worry about her size and her diet." They talked about being healthy and making good food choices. Hope loved D and thought she was gorgeous.

¶ 23    Hope acknowledged that there was a DCFS investigation due to her being in the room with D when D was partially undressed. The investigation came back unfounded. Hope had seen scratches on D's arms. They were not because of Hope's behavior but rather because D would get nervous and scared and feel like she could not "take it." Hope talked to D and said that they would get her a therapist if she needed one, or take a vacation if she needed one. When Robert filed for divorce, Hope said that they should all meet with therapists to manage the stress of the divorce.

¶ 24    Hope did not need supervised parenting time with the children because Hope was not a threat to them. Their anger seemed misdirected and "thrown" at her. Hope had not seen the children since December 2020 because Robert had rejected her requests on the basis that the court order required supervised visits. Hope's mom was not willing to supervise because she was frustrated that the children still acted out with Hope. Hope's sister also was not willing to supervise. Hope did not visit the children when Covid started due to safety issues, in that the children were concerned about the virus and Hope's work at a hotel. Also, Hope's mother was older and her sister was a nurse practitioner who was exposed to Covid patients.

¶ 25    When visitation restarted, D was angry about many things, and Hope was a reservoir for her anger. D would not come down for dinner, but over time things got better, and D would sit and talk with Hope. There were "plenty of examples where her behavior [had] improved," and "plenty of examples where it [fell] apart." D was a teenager, and Hope had to be patient. Things were "definitely better" now.

¶ 26    K was "neutral" in Hope's mind. He was a quiet kid who did not articulate his emotions. Hope was working with her own therapist on how to better communicate with him. Hope wanted the children to reside with her and have the maximum amount of time possible with them, and she did not think that any restrictions were necessary.

¶ 27　Hope was participating in reunification therapy with the children for one hour per week. She did not want the current therapist to continue because the therapist had accused her of things that were not true, such as that Hope gaslighted the children. The therapist seemed to want to blame Hope for everything. She also said that Hope had not followed her suggestions, without saying what those suggestions were. Hope did not think that the positive changes in the kids' behavior were due to the therapist, but rather from Hope teaching them coping skills and the passage of time allowing them to adjust to the divorce. Hope did not think that there should be a court order for therapy.

¶ 28　Robert had gone to parent teacher conferences and taken the kids to the doctor because Hope wanted him to be involved with them. "It was designed by [her] so that Rob could be part of the children's lives because they love him so much." Hope had spoken to the teachers when the children were younger, through fourth grade, when the kids were "still cuddly" and wanted their mother. In fifth and sixth grades, the kids wanted more distance.

¶ 29　Hope restricted access to playdates when the kids were growing up because Robert was a struggling alcoholic, and she did not want anyone to get hurt. He took his last drink in 2012, and "he felt like the shakiness was gone" in 2017. Hope did meet with other parents and took the children to other kids' homes.

¶ 30　 Hope wanted the court to award joint decision-making responsibilities. Hope had left her schedule along with a Christmas card in the marital home's mailbox so that Robert and the children would all know when she was working. She did not have any issues with using My Family Wizard to communicate. She believed that she and Robert could make joint decisions about medical issues because they had done so for a hospital visit that D had before February 2020. Hope wanted the children to be Roman Catholic like her, but when Robert stopped going to church, the children

also stopped. D told her that she wanted to be a witch for her religion, and Hope did not agree with that decision. Hope also wanted to encourage the kids to participate in activities that they had expressed interest in, namely art for D and soccer for K.

¶ 31    Hope believed that the GAL had "flat out lied" in her report and had "misrepresented the situation horribly." The GAL seemed enamored with Robert and was biased. Hope had not alienated the children or Robert from anyone, but rather any distance was caused by Robert's alcoholism. Hope did not know why the children had said what they did, and if they had painted her in a bad light, it was from the stress of the divorce.

¶ 32                                    B. Financial Issues

¶ 33    The parties stipulated to the following. Robert was employed full-time at AbbVie. He earned a "base gross annual salary of $149,735.61," and he earned a "gross salary" of $173,347.45 in 2020. Hope was employed part time and earned gross wages in 2020 of $11,558.98 from Atira Hospitality and $8,974.15 from Jewel Food Stores. The house had a mortgage of $144,264.72. Robert had vested restricted stock units (RSUs) worth $7120.09.

¶ 34    We summarize Robert's testimony as it pertains to the issues on appeal. The parties owned a home in Grayslake, where Robert was currently residing with the children. He did not want to put the house on the market because the kids were currently in school, they wanted to stay at the same school, and they had friends in the neighborhood. Robert was willing to buy out Hope's interest in the house.

¶ 35    Robert had a master's degree in synthetic organic chemistry from Pennsylvania State University. Hope also had a master's degree in chemistry from that university. They both worked at Abbott when they got married. Hope did "analytical chemistry with the pre clinical safety." His income was about $50,000 a year at that time, and Hope's income was slightly less but in the same

range. After five years, his income was about $85,000, and her income was about $80,000. Hope went on maternity leave when she was pregnant with D, and they decided that she would not return to work. Hope was currently earning $11 per hour. Robert believed that she could get a position as a chemist because he worked with chemists regularly, and they were always hiring new people. The starting wages would be between $50,000 and $60,000 per year to start with a contract agency. Robert saw two open positions online with salaries of $46,000 and $49,000, but most of the positions online did not list a salary.

¶ 36    Robert received RSUs at work based on his performance that vested over three-year periods. Each year, he could sell a block of RSUs that had vested, and he usually received between $7000 and $10,000. Robert was additionally eligible to receive a bonus every year in March based on his performance, which could be zero or some other amount.

¶ 37    The parties had agreed to the division of most of their marital personal property. However, they disagreed regarding the curtains and curtain rods in the bedroom and dining room, and the dining room chandelier. Robert wanted these items to remain with the home because they were attached to the house. Also, he did not want to have to replace them if he put the house on the market. The parties typically bought things for the house on their anniversaries, and the items were gifts to both of them rather than to just Hope.

¶ 38    We next summarize Hope's testimony. She worked at two part-time entry level jobs, specifically two 8-hour shifts at Hampton Inn and at a Jewel bakery. When she left her job at Abbott, she was earning $60,000 or less after five years working there. Robert supported her decision to stay home and take care of the children. Hope had a master's degree in chemistry and graduated with a 3.6 GPA Phi Betta Kappa. Hope had not tried to find a job that corresponded with her education and prior work experience because she did not want to be a chemist. She had

worked at labs at Baxter and Abbott, and at both places the jobs were very difficult and "horrible." Hope was not actively looking for a better-paying job or going back to school for further education because she wanted to rise up in the hospitality or bakery fields.

¶ 39   Hope believed that the house was worth $260,000 and wanted the trial court to award it to her. She could compensate Robert for his share through the division of retirement accounts. If she was not awarded the house, she wanted the curtain rods and curtains because they were gifts to her. Every time they bought something for the house, they did so around a holiday, and "who wants curtains other than the wife?" Hope also wanted the dining room chandelier because that "was anniversary for four years. [*sic*]"

¶ 40                              C. Allocation Judgment

¶ 41   The trial court entered an allocation judgment on March 19, 2021, that addressed parenting issues. It found that it was in the children's best interest that their primary residence be with Robert and that he have all significant decision-making responsibilities for their education, health, religion, and extracurricular activities. The trial court stated that:

> "having observed [Hope's] demeanor during trial, [the Court] finds that [she] has engaged in conduct, as described in the testimony and exhibited on the witness stand, that seriously endangers the children's mental, moral, or physical health or that significantly impairs the children's emotional development. Therefore, pursuant to 750 ILCS 5/603.10, the Court finds that [Hope's] decision-making responsibilities should be eliminated and [Hope] should have only supervised parenting time with the minor children pursuant to the terms and conditions of this Allocation Judgment."

The trial court stated that Hope's parenting time had to be supervised "unless and until the mental health professional providing reunification therapy determine[s] that supervision is no longer

necessary, taking into consideration the best interest of the children, agreement of [Robert], or further Court Order." Hope could be supervised by her mother, sister, or any other individual that Hope suggested and Robert approved. The parties could change the parenting schedule at any time, as long as Robert agreed to the change.

¶ 42    The trial court ordered that Hope and the children continue reunification therapy until the mental health professional deemed it no longer necessary. The GAL was to be in contact with the therapist for reports as to the progress of the reunification therapy, and was to provide updates to the parties' attorneys. During the therapy, Hope was to have supervised visitation for one weekday and one weekend day for two hours each. She could attend the children's extracurricular activities with Robert's approval or supervision that he approved. The issue of Hope's parenting time was to be "reviewed as soon as possible after six (6) months of the entry of the Allocation Judgment."

¶ 43                                    D. Dissolution Judgment

¶ 44    The trial court also entered a dissolution judgment on March 19, 2021, finding as follows. Both parties had master's degrees in chemistry. Robert was employed at AbbVie with a base annual salary of $149,735.61, and Hope had gross wages of $8974.15 from Jewel and $11,558.98 from Atira Hospitality. "[B]ased upon [Hope's] education and abilities, [Hope] was underemployed and [was] capable of earning at minimum a gross annual income of $30,000 per year." Pursuant to these figures and the length of the parties' marriage, Robert was to pay Hope $2513.83 monthly in maintenance for 14 years and 1 month. Hope was to pay monthly child support of $946 plus $39 per month as a contribution towards the children's medical, dental, and vision insurance.

¶ 45    Robert was awarded the marital residence, which had a fair market value of $240,000 and a mortgage balance of $144,636.07. Hope was awarded 60% of the home's net equity. Similarly,

she was to receive 60% of the value of the parties' retirement accounts. The parties had $32,734.98 in credit card debt, and Robert was ordered to pay 60% of the debt, with Hope responsible for the remaining 40%. Hope had withdrawn $33,343.34 from her IRA to pay for attorney fees, and 50% of that amount would be considered Robert's contribution towards her fees, since he was entitled to 50% of the marital portion of the withdrawn funds. Robert was not responsible for any additional contribution towards Hope's attorney fees. He was to retain his vested and unvested RSUs as an offset of the value of the parties' vehicles, with Hope's vehicle having a value of $12,462 and Robert's vehicle having a value of $2224 after taking into consideration the vehicle's loan. The curtains, curtain rod, and chandelier were marital property and awarded to Robert.

¶ 46    Hope timely appeal pursuant to Rule 311 (Ill. S. Ct. R. 311 (eff. July 1, 2018)).

¶ 47                                II. ANALYSIS

¶ 48               A. Restrictions on Parenting and Reunification Therapy

¶ 49    Hope first argues that the trial court abused its discretion in restricting her parenting time by requiring supervision, prohibiting her from contacting teachers and counselors, barring her from attending extracurricular activities without Robert's approval, and restricting her ability to modify the parenting schedule. Hope maintains that there was no testimony supporting the trial court's factual finding that she posed a danger to the children. She notes that DCFS concluded that the 2018 incident with D was unfounded, and she argues that the GAL's testimony with respect to K's parenting time being supervised was based on K's subjective feelings of discomfort. Hope contrasts this case to *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶¶ 45, 50, where the trial court had found serious endangerment where the father had, among other things, threatened to make his daughter get out of the car on an interstate ramp and walk home. Hope further argues that the GAL testified that it would be emotionally damaging to D only if Hope spent more than

two hours of unsupervised time with her, yet the trial court ordered that all of Hope's parenting time be supervised.

¶ 50    Section 602.7(a) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) provides that the trial court shall allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020). Section 602.7(b) states:

> "It is presumed both parents are fit and the court shall not place any restrictions on parenting time as defined in Section 600 and described in Section 603.10, unless it finds by a preponderance of the evidence that a parent's exercise of parenting time would seriously endanger the child's physical, mental, moral, or emotional health." 750 ILCS 5/602.7(b) (West 2020).

"Restriction on parenting time" is defined in section 600 of the Marriage Act as "any limitation or condition placed on parenting time, including supervision." 750 ILCS 5/600 (West 2020). Section 603.10(a) of the Marriage Act (750 ILCS 5/603.10 (West 2020)) states:

> "After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders necessary to protect the child."

The statute lists restrictions that the trial court may impose upon parental decision-making and parental time, which include, among other things: reducing, eliminating, or adjusting decision-making or parental time, and requiring supervision. *Id.*

¶ 51    Liberal visitation is the general rule and restricted visitation is the exception because parents have a natural or inherent right of access to their children, and because sound public policy encourages that strong family relationships be maintained. *In re Marriage of Diehl*, 221 Ill. App.

3d 410, 429 (1991). The custodial parent has the burden of proving by a preponderance of the evidence that visitation with the noncustodial parent would seriously endanger the child. *Id.*

¶ 52    Restricting parenting responsibilities is a two-step process. *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 58. First, the trial court must make a factual determination that the preponderance of the evidence shows that the parent has engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development. *Id.* We will not reverse such a finding unless it is against the manifest weight of the evidence. *Id.* ¶ 59. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.* Second, the trial court exercises its discretion in setting appropriate restrictions to parenting responsibilities to provide for the child's safety and welfare. *Id.* ¶ 57. We will not disturb the trial court's restrictions unless the trial court abused its discretion, meaning that no reasonable person would take the trial court's view. *Id.* ¶ 61.

¶ 53    We conclude that it was not against the manifest weight of the evidence for the trial court to find by a preponderance of the evidence that Hope had engaged in conduct that seriously endangered the children's mental, moral, or physical health or that significantly impaired the children's emotional development. The GAL, who was appointed by the court to make recommendations on parenting time and decision-making responsibilities, testified that the children were in "severe crisis as it related to their relationship" with Hope. According to the GAL, D discussed years of verbal and emotional abuse by Hope. Although DCFS found the 2018 incident to be unfounded, it still upset D to the extent that she was physically shaking when talking about it, and the GAL testified that D's therapist indicated that there was "more to it than what had been investigated during that time." The GAL's report stated that D said that Hope had called her names

like "bitch," "slut," and "fat."[1] It was undisputed that D had been scratching herself due to emotional issues and seeing a therapist as a result of the self-harm. The GAL testified that K was afraid to be with Hope because she would engage him in inappropriate conversations about the divorce and constantly asked if he loved her. The police were called to the house in 2018 because Hope was screaming, and the GAL believed that K ended up running down the street. Both D and K had told the GAL that they did not see family and friends because Hope did not want them to have relationships with other people, and that in 2019 the family members were "living separately in the same house." The children described getting into screaming matches with Hope, at which point Robert would remove them from the house. The GAL testified that she talked to the children's therapists, and that the therapists confirmed what the children told her. In the GAL's conversations with Hope, Hope was focused on herself and "not really willing to concern herself with what [was] happening to her children."

¶ 54     Robert provided similar testimony regarding Hope calling the children names and isolating the family from friends and relatives. Hope herself testified that from the time D began solid food Hope "always had to worry about her size and her diet," and that the children were often angry at her. In making its ruling, the trial court also took into account its observations of Hope's "demeanor during trial." See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 31 (the trial court is in the best position to determine a witness's credibility). In the report of proceedings, the trial court stated

_____

[1] Hope argues that the GAL's report was not admitted into evidence, but the reports are listed as "stipulated" exhibits on the "Exhibit Receipt," and they are also separately listed as being admitted as Respondent's Exhibit 1. Even without the reports, our conclusions would remain the same.

that it observed that Hope was "shaking her head negatively," during the GAL's testimony, which the court stated was understandable, but she was also "waving her pen at the camera." The trial court stated that it was not sure if Hope thought that "histrionics" were helpful to her case, but that it advised that she stop. Based on all of these considerations, we find no basis to disturb the trial court's finding of serious endangerment to the children.

¶ 55    Regarding supervision of visitation, it is true that the GAL testified that if D spent "more than two hours with mom in an unsupervised situation, " it would be emotionally damaging to D. However, reading the transcript as a whole, it is clear that the GAL was advocating that all of Hope's parenting time with the children initially be supervised. The GAL testified that the parenting time should be supervised, to the extent that "extreme endangerment mentally and emotionally *** could occur in the event that the children [were] put in a situation where regular parenting time or unsupervised at this time would possibly cause." Based on the finding of serious endangerment and the GAL's recommendation of supervised visitation, we conclude that the trial court did not abuse its discretion in requiring that Hope's parenting time initially be supervised.

¶ 56    On the subject of extracurricular activities and education, the trial court awarded Robert all significant decision-making responsibilities. The evidence at trial showed that Robert had been the person responsible for attending parent-teacher conferences in the past five years and that he had taken on all primary parental responsibilities for the children. The GAL testified that the parties did not speak to each other and would be unable to communicate regarding decisions for the children. Given that the trial court had ordered that Hope's parenting time with the children be supervised, it was logical for the trial court to also put limits on her attendance at events where the children would be present, specifically that Robert approve or that Hope have supervision that Robert approved. Accordingly, we find no abuse of discretion on this limitation.

¶ 57    Hope relatedly argues that the trial court abused its discretion by requiring her to engage in reunification therapy. Section 607.6 of the Marriage Act states that the trial court "may order individual counseling for the child, family counseling for one or more of the parties and the child, or parental education for one or more of the parties" if, among other things, "the child's physical health is endangered or that the child's emotional development is impaired. 750 ILCS 5/607.6 (West 2020).

¶ 58    As discussed, it was not against the manifest weight of the evidence for the trial court to find serious endangerment. Therefore, the trial court could order the reunification therapy under section 607.6. We conclude that such a requirement was not an abuse of discretion in light of the GAL's testimony that the children trusted the reunification therapist, that they were learning and applying coping mechanisms when talking with Hope while the reunification therapist was present, and that Hope had not seen the children for several months prior to trial. We note that one of the goals of requiring Hope to engage in reunification therapy was that it lead to unsupervised visitation with the children.

¶ 59    Hope additionally argues that the trial court erred in restricting her ability to petition the court to modify her visitation schedule, in that it ordered her to attend therapeutic reunification sessions and made the therapist's recommendation that a modification was in the children's best interests a "prerequisite" to any modification. Hope asserts that section 603.10 of the Marriage Act (750 ILCS 5/603.10 (West 2020)) does not permit the court to preclude a party from requesting a modification at some point in the future, and does not allow it to defer the determination of the children's best interests to a therapist rather than the court itself.

¶ 60    Contrary to Hope's argument, the trial court did not order that the therapist's recommendation was a prerequisite to modification. The allocation judgment states that Hope's

"parenting time with the children shall be supervised, unless and until the mental health professional providing reunification therapy determine[s] that supervision is no longer necessary, taking into consideration the best interest of children, agreement of [Robert], *or further Court Order*." (Emphasis added.) Accordingly, the trial court could modify the parenting time without the therapist's approval. More explicitly, the allocation judgment states: "With respect to provisions for any future modification(s) of the Parenting Plan, the terms and provisions of 750 ILCS 5/610.5 shall apply to this Parenting Plan." Section 610.5(a) of the Marriage Act states:

> "Unless by stipulation of the parties or except as provided in Section 603.10 of this Act, no motion to modify an order allocating parental decision-making responsibilities, not including parenting time, may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his or her mental, moral, or physical health or significantly impair the child's emotional development. *Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child.*" 750 ILCS 5/610.5 (West 2020).

Accordingly, Hope may seek to modify the parenting time at any point, recognizing that she would have the burden of showing that there has been a change of circumstances that requires modification to serve the children's best interests. We note that the judgment also requires that the parties first mediate disputes pertaining to parenting time. Moreover, the trial court ordered that the issue of Hope's parenting time be reviewed six months after the entry of the judgment, which will occur shortly after this appeal is resolved.

¶ 61                              B. Custody and Parenting Time

¶ 62    Hope next argues that it was against the manifest weight of the evidence to award Robert primary residential custody of the children and the majority of parenting time. She points out that the trial court ordered that she should have parenting time only twice per week, for only two hours each session, and supervised by her mother, sister, or any other person that Robert approved. Hope argues that both parties testified that Hope had not been able to exercise parenting time since December 2020 for the specific reason that she had not found someone willing to supervise parenting time. Hope maintains that the trial court's ruling therefore resulted in a complete cessation of her parenting time. She further argues that in making its ruling, the trial court did not make any factual findings or list any factors set forth in section 602.7(b).

¶ 63    The trial court is to allocate parenting time according to the child's best interests. 750 ILCS 5/602.7(a) (West 2020). In determining the child's best interests, the trial court is to consider all relevant factors, including: the parents' wishes; the child's wishes; the amount of time each parent has performed child caretaking functions in the 24 months before the filing of a petition for the allocation of parental responsibilities; any prior agreement or course of conduct between the parents relating to caretaking functions; the relationship of the child with their parents, siblings, and other significant individuals; the child's adjustment to home, school, and community; the mental and physical health of all involved individuals; the child's needs; the distance between the parents' residences; whether a restriction on parenting time is appropriate; physical violence or the threat thereof by the child's parent; the parents' willingness and ability to place the child's needs ahead of their own needs; the parents' willingness and ability to encourage a close relationship between the other parent and child; abuse against the child or others in the household; whether one of the parents is a sex offender; the terms of any military family-care plan; and any other relevant factor. 750 ILCS 5/602.7(b) (West 2020). We will not overturn a trial court's decision unless it

abused its discretion or its decision is against the manifest weight of the evidence. *In re Marriage of Whitehead & Newcomb-Whitehead*, 2018 IL App (5th) 170380, ¶ 15.

¶ 64    The trial court is not required to make explicit findings or reference each factor in determining the child's best interests (*In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43), and here the record does not affirmatively indicate that the trial court failed to consider the factors (see *id.* ¶ 44). To the contrary, the trial court explicitly referenced section 602.7. Based on the trial court's finding that Hope had engaged in conduct that seriously endangered the children's mental, moral, or physical health or that significantly impaired the children's emotional development, discussed *supra* ¶¶ 53-54, in conjunction with the statutory factors, it was not an abuse of discretion or against the manifest weight of the evidence for the trial court to award Robert primary residential custody and the majority of parenting time. We additionally note that the GAL testified to the children's positive relationship with Robert. She testified that he was "exemplary" in how he parented the children and that they had a close, loving, and trusting relationship with him and felt safe with him.

¶ 65    We also do not find a basis to disturb the amount of parenting time that the trial court ordered. Hope had not exercised parenting time for several months preceding the trial, and the GAL recommended in her updated report that there needed to be a transition period with supervised parenting time for two hours two times per week. The allocation judgment did not limit supervision to just Hope's mother or sister, but rather any other individual that Robert also approved. Further, the GAL suggested the Family Visitation Center in Mundelein as a place where supervised visitation could occur, and there is no evidence in the record that Hope attempted to have visitation there or at a similar facility. Accordingly, her argument that the trial court effectively denied her any parenting time is without merit.

¶ 66                                    C. Decision-Making Authority

¶ 67    In a related argument, Hope asserts that the trial court erred in allocating sole decision-making authority to Robert. She argues that the trial court did not consider the relevant statutory factors and did not provide any explanation of why eliminating her parental responsibilities was necessary to protect either child. Hope argues that the GAL did not recite a single example of Hope making a decision related to school, extracurricular activities, medical treatment, or religious upbringing that had any deleterious effect on either child.

¶ 68    As with parenting time, the trial court is to allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2020). To determine the child's best interests, the trial court is to consider all relevant factors, including a list of factors that largely overlaps with the factors considered in allocating parenting time. See *id.* 602.5(c). We will not reverse a trial court's ruling on the allocation of decision-making responsibilities unless the decision was against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47.

¶ 69    As previously discussed, the trial court was not required to make explicit findings or reference each factor in determining the children's best interests (see *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43), and here the trial court referenced section 602.5. The GAL recommended that Robert have all decision-making authority regarding the children's education, healthcare, religion, and extra-curricular activities because the parties did not communicate. The GAL gave examples of Hope's mother texting Robert that Hope wanted parenting time, and Hope leaving her work schedule in the mailbox. There was also evidence that Robert had been exercising primary parental responsibilities for the children for the previous five years. In light of these considerations, the statutory factors, and the fact that Hope's parenting time had to be supervised

due to, among other things, a finding of serious endangerment, it was not against the manifest weight of the evidence for the trial court to allocate all decision-making authority to Robert.

¶ 70                                   D. Maintenance and Child Support

¶ 71    Hope next contests the trial court's awards of $2513.83 in monthly maintenance to her and $946 in monthly child support to Robert, arguing that the maintenance should be higher and that the child support should be lower. She argues that the trial court improperly imputed an income of $30,000 to her without finding that she was voluntarily unemployed, was attempting to evade a support obligation, or had failed to take advantage of an employment opportunity. She argues that it was undisputed that she had not worked for about 15 years and had a total annual salary of about $20,000 in 2020.

¶ 72    Hope additionally argues that the trial court erred in finding that Robert's income was only $149,735. She notes that "gross income" for maintenance purposes includes "all income from all sources" (see 750 ILCS 5/504(b-3), 505(a)(3) (West 2020)), that the parties stipulated that $149,735 was merely his base salary, and that he earned a gross income of $173,347.45 in 2020. Hope points out that Robert also testified that he receives RSUs every February in the amount of $7000 to $10,000, and that he receives bonuses in March. Hope contends that the trial court should have used Robert's stipulated income of $173,347.45.

¶ 73    We presume that a trial court's determinations in awarding maintenance and child support are correct, and we will not reverse its findings as to income or its awards unless the trial court abused its discretion. *In re Marriage of Lugge*, 2020 IL App (5th) 190046, ¶ 15; see also *In re Marriage of Evanoff & Tomasek*, 2016 IL App (1st) 150017, ¶ 23 (a trial court's determination of income in a dissolution case is reviewed for an abuse of discretion). A trial court may deviate from statutory maintenance guidelines based on a consideration of the same factors used to determine

whether a maintenance award is appropriate in the first place. 750 ILCS 5/504(b-1)(1), (2), (b-2)(2) (West 2020). One of these factors is the parties' respective present and future earning capacities (750 ILCS 5/504(a)(3) (West 2020)), which includes imputed income (*In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39)). "Imputation is appropriate in cases of voluntary unemployment or voluntary *under*employment." (Emphasis in original.) *Id.* Similarly, the trial court has the authority to impute income to an underemployed noncustodial parent for child support purposes. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 44. The child support statute states that if a parent is voluntarily unemployed or underemployed, child support shall be calculated using a determination of potential income, which is based on employment potential and probable earnings considering the obligor's work history, occupational qualifications, job opportunities, and earning levels in the community. 750 ILCS 5/505(a)(3.2) (West 2020).

¶ 74    In order to impute income, the trial court must find that the payor: (1) has become voluntarily unemployed or underemployed, (2) is attempting to evade a support obligation; or (3) has unreasonably failed to take advantage of an employment opportunity. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 39. In imputing income, the trial court may consider the supporting parent's income from previous employment, but it should not base the imputed income on outdated data that no longer reflects prospective income. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 40.

¶ 75    We conclude that the trial court did not abuse its discretion in imputing a $30,000 income to Hope for maintenance and child support purposes. Hope had a master's degree in chemistry, and at the time she stopped working about 15 years prior, she was earning either around $60,000, according to her testimony, or $80,000, according to Robert. Robert testified that he worked with chemists and that they often had job openings paying $50,000 to $60,000, and that he had seen

listings online for chemists with salaries of $46,000 and $49,000. Hope testified that she did not want to return to working at a lab as a chemist because the experience had been "horrible." However, she instead took two part-time entry level positions paying $11 per hour, with no plans to look for higher paying jobs, such as jobs requiring an undergraduate or graduate degree, or go back to school to obtain education in a different field. Therefore, evidence supported the trial court's finding that Hope was voluntarily underemployed. The trial court imputed an income of $30,000, which was just $10,000 more than she earned in 2020 and half or less than half of the salary she earned when she left the workforce 15 years prior. The trial court acted within its discretion in this imputation of income. *Cf. In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 41 (the trial court's finding of voluntary underemployment and its imputation of an income of $25,000 to the petitioner was not an abuse of discretion where the petitioner had a degree in chemistry and had previously earned up to $125,000, but more recently earned $12,000 as a tennis instructor and thereafter worked only sporadically).

¶ 76    Regarding Robert's income, he notes that tax returns were in evidence showing that he earned a gross income of $145,494 in 2018 and $146,245 in 2019. [2] Robert maintains that setting maintenance and child support on an amount consistent with the income he earned over the three years before trial was entirely within the trial court's discretion (see *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1024-25 (2003) (income averaging is within the trial court's discretion)). Robert argues that Hope herself requested maintenance of $2623 per month in her proposed

---

[2] The adjusted gross income on the 2018 tax return was $146,210, and it was $146,463 on the 2019 tax return. Additionally, adjusted gross income is not equivalent to the statutory definitions of gross income or net income. See 750 ILCS 5/504.

findings of fact and judgment yet claims error in the trial court's award to her of just $109 less, which he labels as a *de minimus* difference. He contends that she further characterized the RSUs as property and sought an award of them as part of the division of property, so she cannot argue for the first time on appeal that they should be considered income.

¶ 77    We agree with Hope that the trial court abused its discretion in its calculation of Robert's income. For purposes of maintenance and child support, "gross income" is defined as "all income from all sources." 750 ILCS 5/504(b-3), 505(a)(3) (West 2020).[3] The parties stipulated that in 2020, Robert earned a "base gross annual salary" of $149,735.61 and a "gross salary" of $173,347.45. Given that the parties labeled the latter Robert's "gross salary," the difference between the two was presumably his bonus income. The trial court made no mention of Robert's stipulated "gross salary" or his bonus income, making it appear that the trial court overlooked this issue. We acknowledge that Robert testified that he could receive no bonuses some years, and we recognize that some courts use income averaging (see *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 95; *In re Marriage of Hubbs*, 363 Ill. App. 3d 696 (2006) ("Using an average income for the previous three years of employment is a reasonable method for determining net income where income has fluctuated widely from year to year")), but averaging Robert's income from the prior three years, including the $173,347.45, would lead to a higher average salary than Robert's 2020 "base gross annual salary" of $149,735.61 used by the court.[4] We therefore conclude that the

_____

[3] The parties' net incomes are used in calculating basic maintenance and support obligations. See 750 ILCS 5/504(b-1), 505(a)(1.5) (West 2020).

[4] We express no opinion as to whether income averaging would be appropriate here, as that issue is not directly before us.

trial court abused its discretion in determining Robert's gross income because it did not account for "all income from all sources." 750 ILCS 5/504(b-3), 505(a)(3) (West 2020). Correspondingly, we reverse its rulings on the amount of maintenance and child support, and we remand so that it may expressly take into account Robert's 2020 "gross salary" of $173,347.45. We disagree with Robert's position that the difference between what Hope is claiming his salary should be and the figures that the trial court used is *de minimus* because it amounts to an award of just $109 less to her[5]; the alleged difference is $109 per month for over 14 years, which is significant, and it does not include any potential reduction to the child support she was ordered to pay.

¶ 78    We do agree with Robert that the trial court did not abuse its discretion in treating the RSUs as property as opposed to a part of Robert's income. As Robert highlights, Hope's proposed judgment characterized the existing RSUs as property and requested that she receive 70% of their value. Instead, the trial court awarded them to Robert as an offset of the value of the vehicles awarded, which was within its discretion.

¶ 79    E. Valuation and Award of Marital Residence, and Award of Curtains and Chandelier

¶ 80    Hope further argues that the trial court erred in valuing the marital residence at $240,000. She argues that the only evidence before the court on the issue was her unrebutted testimony that she believed that the residence was worth $260,000.

¶ 81    In a marital dissolution proceeding, a trial court's factual findings, including the fair market value of property, will not be reversed unless they are against the manifest weight of the evidence. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 29.

---

[5] We also express no opinion as to whether the $109 figure is correct.

¶ 82　In this case, Robert testified that a real estate agent looked at the house and at comparables, and estimated the home's value at $230,000 to $240,000. The trial court sustained Hope's objection to this testimony. Robert argues that the trial court had evidence before it of his valuation of the property in that his financial affidavit was admitted into evidence by stipulation of the parties, and in it he represented under oath that the home's fair market value was $240,000.

¶ 83　We note that the "Exhibit Receipt" states that the parties stipulated to an exhibit of a "Marital Property Home Market Analysis," in which the home's value was estimated at $235,000 to $240,000. Considering this evidence, along with Robert's financial affidavit, it was not against the manifest weight of the evidence for the trial court to value the home at $240,000.

¶ 84　Hope additionally argues that the trial court's award of the residence to Robert was an abuse of discretion. She maintains that the trial court did not discuss any statutory factors in making its ruling, and she highlights the disparity in the parties' income, and correspondingly Robert's greater ability to acquire a new residence.

¶ 85　The trial court is to divide marital property in "just proportions" considering all relevant factors, including enumerated statutory factors. 750 ILCS 5/503(d) (West 2020). The trial court "shall make specific factual findings as to its classification of assets as marital or non-marital property, values, and other factual findings supporting its property award." 750 ILCS 5/503(a) (West 2020). The distribution of marital property is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34.

¶ 86　We conclude that the trial court acted within its discretion in awarding the marital residence to Robert. Although the statute requires the trial court to make factual findings supporting its award, it does not require that trial court to list or discuss each statutory factor. See 750 ILCS

5/503(a) (West 2020). Notably, one of the factors is "the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children." *Id.* 503(d)(5). This factor heavily weighs in Robert's favor because he was given residential custody of the children, as compared to Hope's initially limited, supervised parenting time. The trial court accounted for Robert's greater income and earning capacity by awarding Hope 60% of the parties' marital assets, including requiring Robert to pay Hope 60% of the equity in the marital home, and assigning Hope only 40% of the parties' marital debts. We therefore find no abuse of discretion in the trial court's ruling regarding the marital home.

¶ 87 Last, Hope argues that the trial court abused its discretion in determining that the curtains, curtain rods, and chandelier were marital property. She argues that she testified that these items were anniversary gifts from Robert to her, and that his testimony that they were gifts to both of them was preposterous on its face.

¶ 88 A trial court must classify property as marital or non-marital before distributing the property. *In re Marriage of James & Wynkoop*, 2018 IL App (2d) 170627, ¶ 20. Non-marital property includes property received as a gift. 750 ILCS 5/503(a)(1) (West 2020). We will not disturb a trial court's classification of property as marital or nonmarital unless the classification is against the manifest weight of the evidence. *In re Marriage of James & Wynkoop*, 2018 IL App (2d) 170627, ¶ 20.

¶ 89 The trial court's classification of the curtains, curtain rods, and chandelier as marital property was not against the manifest weight of the evidence. Although Hope testified that they were gifts to her, Robert testified that they bought gifts for the house on their anniversaries for both of them. It was up to the trial court to assess the parties' credibility and make a finding on

this issue. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 31. Robert's testimony was not inherently unreasonable, as the disputed items were attached to the house for all family members to enjoy, as opposed to personal gifts to Hope, like jewelry. We further conclude that the trial court acted within its discretion in awarding these items to Robert because they were installed in the home that he was awarded.

¶ 90                                    III. CONCLUSION

¶ 91    For the reasons stated, we reverse the trial court's determination of Robert's income and its corresponding awards of maintenance and child support, and we remand for the case for the trial court to revisit these issues. We affirm the trial court's decision in all other respects.

¶ 92    Affirmed in part and reversed in part. Cause remanded.